Filed 11/15/22 In re Paris G. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re PARIS G., a Person Coming Under the Juvenile Court Law. | B313465 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JENNIFER G., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. No. 18CCJP04888B |

APPEAL from an order of the Superior Court of Los Angeles County, Julie Fox Blackshaw, Judge. Affirmed.

Pamela Rae Tripp for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel for Plaintiff and Respondent.

# INTRODUCTION

Jennifer G. (mother) appeals from the juvenile court's disposition order declaring her daughter Paris a dependent of the court. Mother contends insufficient evidence supports the court's jurisdiction finding that she placed Paris at risk of serious physical harm when she abducted the child and concealed herself and the child for six months. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Family Background and Initiation of Dependency Proceedings

Paris was born in January 2014. Mother and Jack Z. (father) split up about two years later. Since then, the parents have been involved in a contentious custody dispute.

Between June 2016 and September 2019, the Department of Children and Family Services (Department) received more than 10 referrals alleging father physically, sexually, or emotionally abused Paris. All the referrals against father were deemed unfounded or inconclusive. The Department suspected mother coached Paris to make false allegations against father.

Around late December 2019, the family court issued an order granting mother and father shared custody of Paris, with the parents to alternate custody every week. That order included a provision granting father sole physical custody of Paris should mother "fail[ ] to timely exchange [Paris] on any one occasion for any reason."

One day in mid-January 2020, while father had custody of Paris, mother removed the child from school. Unbeknownst to father, mother had moved out of her home in Redondo Beach. Mother didn't tell father where she took the child, and mother

2

didn't answer her phone when father and law enforcement tried contacting her.

On January 16, 2020, the court presiding over the parents' family law case awarded father sole physical custody of Paris. Around the same time, father filed a child abduction report. Several days later, the Los Angeles County District Attorney's Office began investigating mother for kidnapping.

Between mid-January and mid-July 2020, father was unable to contact mother or Paris. During that time, mother obtained several temporary restraining orders against father at the Torrance courthouse. Each restraining order was dissolved, however, because mother never appeared at any of the follow-up hearings.

On July 20, 2020, mother surrendered to law enforcement at the Torrance courthouse after she obtained another temporary restraining order against father. Mother claimed she didn't know Paris had been reported missing or that father had been awarded sole custody of the child. Mother was later charged with several felonies, including kidnapping, child custody deprivation, and eavesdropping on law enforcement officers and social workers. The criminal court issued a protective order prohibiting mother from contacting Paris and father.

When mother was apprehended, Paris was staying with a babysitter in Lawndale. Paris told the Department that she had been living with mother and mother's boyfriend, Frank, but the child didn't disclose where they were living. The Department took Paris into protective custody because the July 20, 2020 temporary restraining order prevented the child from being released to father.

On July 22, 2020, the Department filed a dependency petition on Paris's behalf. The petition, as later sustained, alleged mother "abducted and intentionally concealed the child from [father] for a six-month period. Such abduction of the child and conduct by the mother endangers the child's physical health, safety and wellbeing and places the child at risk of serious physical harm" (Welf. & Inst. Code,[1] § 300, subd. (b); b-1 allegation).[2]

On July 23, 2020, Paris was returned to father's custody after the court presiding over the parents' family law case removed the child as a protected party from the July 20, 2020 temporary restraining order and vacated a temporary custody order granting mother custody of the child. The January 16, 2020 family law order granting father sole custody of Paris remained in place.

On July 27, 2020, the court held the detention hearing. The court found the petition alleged a prima facie case, ordered Paris detained from mother's custody, and released the child to father's custody.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] The court dismissed allegations that (1) father physically abused Paris (§ 300, subds. (a) & (b); a-1, b-3 allegations); (2) mother failed to make an appropriate plan for the child's care while mother was incarcerated (§ 300, subd. (b); b-2 allegation); and (3) the parents' contentious custody battle placed the child at risk of substantial emotional harm (§ 300, subd. (b); b-4 allegation).

## 2.   Jurisdiction and Disposition

In October 2020, the Department interviewed Paris and father. Mother refused to be interviewed.

Paris and father appeared comfortable and well-bonded with each other. When asked if anyone in father's home ever hit her, Paris stated she "accidentally told a lie. I told everyone that [father] hit me" because she "didn't want to get [mother] mad." According to Paris, mother didn't want the child to stay with father. Although Paris didn't confirm mother asked her to lie about father, the child acknowledged she "had a lot of secrets with her mother."

Paris told the Department that she didn't see or speak to father for a long time after mother picked her up from school in January 2020. Paris explained that "[e]very time someone called, mom didn't answer" because she was hiding the child from father. According to Paris, mother made the child hide in a closet whenever someone came to the home where they were living.

In February 2021, the criminal court modified the protective order against mother to allow her monitored virtual visits with Paris in a therapeutic setting. Mother did not begin visiting Paris until March 2021, however, due to difficulties finding a qualified therapist to conduct the visits.

Mother's visits were going well. Mother engaged in age-appropriate behavior, and Paris appeared happy to see her. Mother and Paris often talked about their recent activities and how Paris was doing in school, and they made plans for what they would do when they could begin visiting each other in person.

The court held the jurisdiction hearing over three days in early June 2021. Paris testified on the first day of the hearing.

Mother would sometimes make Paris act like she feared father when he picked her up from school, even though Paris wasn't afraid of him. Mother also instructed Paris to tell people that father hit the child. According to Paris, however, neither parent ever hurt her. After she absconded with Paris, mother sometimes made the child hide in a garage to conceal her from the police.

The court sustained the b-1 allegation and dismissed the petition's remaining allegations. The court found mother endangered Paris's physical wellbeing and safety and created a risk of serious physical harm when she abducted the child.

The court explained its decision to sustain the b-1 allegation as follows: "[M]other's abduction and concealment of Paris created a serious risk of harm to the child. In essence, mother kept the minor captive in her custody while the mother engaged in criminal and dangerous behavior. Mother was on the lam for six months and the child was forced to be with her. Mother cut off communication between the child and her father. Mother was unwilling to surrender the child to authorities or permit the child to return to her father, which in turn resulted in mother being apprehended by law enforcement finally at the courthouse in Torrance. [¶] Law enforcement's need to apprehend mother could very possibly have resulted in an incident of violence or danger and put the child at risk of serious harm. Involving a child in criminal behavior is never safe. Hiding a child in garages and closets is not healthy for a child physically or emotionally. A parent who unlawfully abducts a child, subjects a child to physical risk of harm, which warrants jurisdiction of the courts. … [¶] … [T]he court believes also that the child remains at risk because the mother has not acknowledged any wrongdoing or that she put the child in danger. The court has no confidence

that mother understands these risks and, therefore, finds the child continuing to be at risk from the mother."

At the disposition hearing, the court declared Paris a dependent of the court. The court removed Paris from mother's custody and placed the child with father. The court maintained mother's schedule of monitored virtual visits with Paris in a therapeutic setting and directed mother to attend individual counseling and to participate in a parenting program focused on high conflict resolution.

Mother appeals.

## DISCUSSION

Mother contends insufficient evidence supports the court's finding sustaining the b-1 allegation. Specifically, mother argues there is no evidence that she placed Paris at risk of serious physical harm when she abducted the child and concealed herself and the child from father and law enforcement. Alternatively, mother argues she did not pose any risk of harm to the child by the time of the jurisdiction hearing. Mother doesn't challenge the court's disposition order removing Paris from her custody or any aspect of her court-ordered case plan. As we explain, substantial evidence supports the court's jurisdiction finding.[3]

---

[3] In the statement of facts in her opening brief, mother suggests the court "prejudicially" infringed her constitutional rights by requiring her lead counsel, rather than one of the other attorneys representing her, to question witnesses at the jurisdiction hearing. Mother fails to develop any argument, however, explaining how she was prejudiced by the court's decision. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 407 [to prevail on appeal, an appellant must demonstrate how she was prejudiced by the court's alleged error]; see also Cal. Const., art. VI, § 13.) Nor has mother developed this argument in the argument section

Section 300, subdivision (b)(1), allows a juvenile court to exercise jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Subdivision (b)(1) requires only that a parent has failed or is unable to adequately supervise or protect her child. The statute does not require negligent or culpable conduct by the parent. (*In re R.T.* (2017) 3 Cal.5th 622, 629 (*R.T.*).)

"The juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm from the parent's … conduct. [Citation.]" (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.) The court may consider past events as an indicator of whether the child faces a current risk of harm because "[a] parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) A parent's denial of wrongdoing or failure to recognize the negative impact of her conduct is also relevant to determining risk under section 300. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.) Nevertheless, to show the child faces a risk of harm at the time of the jurisdiction hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 136.)

---

of her brief, let alone under a separate heading. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [each brief must state "each point under a separate heading or subheading summarizing the point"].) By failing to adequately develop this argument, Mother has forfeited any claim that the court erred when it required her lead counsel to question witnesses at the jurisdiction hearing. (*In re S.C.*, at pp. 406–407.)

We review a juvenile court's jurisdiction finding for substantial evidence. (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.) We will affirm the finding if it is supported by evidence that is reasonable, credible, and of solid value. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) We review the record in the light most favorable to the court's findings and draw all reasonable inferences from the evidence in favor of those findings. (*R.T.*, *supra*, 3 Cal.5th at p. 633.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re R.V.*, at p. 843.)

Substantial evidence supports the court's finding sustaining the b-1 allegation. By abducting Paris and concealing her from father and law enforcement for six months, mother created a dangerous living situation for the child. As the court acknowledged, making a child hide inside a garage or a closet is unsafe, especially when a child is six years old, like Paris was at the time of the events leading to this case. A young child could hurt herself with tools or other hazardous objects often stored in a garage, or the child could wander from the home if left unattended in a garage. But most importantly, by concealing Paris during an active kidnapping investigation, mother created a risk that the child would be exposed to a violent confrontation with the police. Although such a confrontation fortunately did not occur in this case, that does not mean mother's actions did not pose a risk of serious harm to Paris. (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216 ["court need not wait until a child is seriously abused or injured to assume jurisdiction and take necessary steps to protect the child"].)

It also was reasonable for the court to find mother continued to pose a risk of harm to Paris. By the time of the

jurisdiction hearing, mother had yet to acknowledge she did anything wrong when she abducted Paris and concealed the child for six months. (*In re A.F.*, *supra*, 3 Cal.App.5th at p. 293 [a parent's refusal to acknowledge wrong-doing or the impact of her conduct on her child is relevant to determining whether there exists a current risk of harm].) Mother also has an extensive history of coaching Paris to make false claims that father abused her, and mother made several unsubstantiated requests for restraining orders to prevent father from seeing his child. Nothing in the record suggests mother wouldn't try to conceal Paris again and continue to expose the child to the same dangers that led to this case if the court did not exercise jurisdiction over the child. (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133 [a parent's past conduct is relevant in determining whether the child faces a current risk of harm].)

Mother argues this case is analogous to *In re B.T.* (2011) 193 Cal.App.4th 685 (*B.T.*), abrogated on other grounds by *R.T.*, *supra*, 3 Cal.5th 622. Mother's reliance on *B.T.* is misplaced. In that case, a 38-year-old mother had a sexual relationship with her 14- or 15-year-old neighbor, which resulted in the mother becoming pregnant with B.T. (*B.T.,* at pp. 688–689.) The mother was criminally prosecuted, and the juvenile court found her affair with her minor neighbor placed her children—two teenagers, a 9-year-old, and infant B.T.—at risk of sexual abuse. (*Id.* at pp. 689–691.)

The court of appeal reversed the jurisdiction findings, concluding there was no substantial evidence that the mother's consensual sexual relationship with an unrelated minor placed her children at a current risk of harm. (*B.T.*, *supra*, 193 Cal.App.4th at pp. 694–697.) It was undisputed that the mother's

children were well adjusted and cared for and that the mother had never abused them, sexually or in any other manner. (*Ibid*.) There also was no evidence, including no expert testimony, suggesting the mother's sexual relationship with an unrelated minor created a current risk of harm to B.T. or any of the mother's other children. (*Id*. at pp. 695, 697.)

This case is distinguishable. Unlike the mother in *B.T.*, mother involved her child in criminal conduct, and it was that conduct (abducting and concealing a child) that created a risk of harm to Paris. Further, mother's past conduct (her repeated attempts to deprive father of custody of Paris without justification) and her failure to acknowledge the wrongfulness of her conduct that led to this case amply support a finding that mother still poses a risk of harm to Paris.

In short, substantial evidence supports the court's jurisdiction finding.

## DISPOSITION

The juvenile court's jurisdiction finding and disposition order are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                             LAVIN, J.

WE CONCUR:



EDMON, P. J.



RICHARDSON (ANNE K.), J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.